IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 06–cv–00716–EWN

MARILYN GRIEGO BRANDAU,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a social security benefits appeal.  Plaintiff Marilyn Griego-Brandau challenges the final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits.  Jurisdiction is premised upon 42 U.S.C.A. § 405(g) (West 2007).

### FACTS

*1.*    ***Medical Evidence***

    *a.*    ***Medical Evidence Before the Administrative Law Judge***

      Plaintiff was born on August 9, 1958 and was forty years old at the onset of her alleged disability and forty-five years old on the date her insured status expired.  (Admin. R. at 490 [filed

June 19, 2006] [hereinafter "Admin. R."].)  Plaintiff has an eleventh grade education and has

worked in the vocationally relevant past as a waitress, cook, food service manager, restaurant

hostess, and bartender.  (*Id*. at 153.)  Plaintiff alleges that she became unable to work beginning

on January 2, 1999 due to back pain, Sjögren's syndrome, fibromyalgia, bursitis in her left hip,

depression, chronic pain disorder, and anxiety.[1]  (*Id*. at 133.)

Plaintiff indicated that her impairments began to affect her in 1991 and gradually worsened

through 1999, at which point she became unable to work because of them.  (*Id*.)  On September

17, 1999, Plaintiff was hit by a car in a driveway and was examined at the Mercy Medical Center

emergency room in Durango, Colorado.  (*Id*. at 303–09.)  Emergency room attending physician

Anthony Demond, M.D. took X-rays of Plaintiff's cervical spine and found narrowing of disc

space, which Dr. Demond found to be "consistent with minimal degenerative disk [sic] disease."

(*Id*. at 308.)

On August 7, 2002, Plaintiff visited Stuart Kassan, M.D. complaining of back pain and

stiffness.  (*Id*. at 324.)  Dr. Kassan noted that Plaintiff showed increasing joint and fibromyalgia

symptomatology, as well as bursitis and back pain symptoms.  (*Id*.)  Dr. Kassan prescribed

medications and expressed his hopes that Plaintiff would undergo magnetic resonance imaging

---

[1]Sjögren's syndrome is a disease of unknown cause marked by three outstanding
afflictions: (1) dry eye syndrome, with or without enlargement of the glands that produce tears;
(2) dry mouth, with or without enlargement of the salivary glands; and (3) connective tissue
disease, usually rheumatoid arthritis, but sometimes lupus or other diseases.  5–S J.E. SCHMIDT,
M.D., ATTORNEYS' DICTIONARY OF MEDICINE  3757 (Matthew Bender 2005).  Fibromyalgia is a
muscular disease characterized by tenderness, dull and persistent pain, and stiffness of muscles,
regions where tendons are inserted into bones, and nearby soft tissues.  2–F *id*. 1790.  Bursitis is
an inflammation of the fluid sacs between bones in joints.  1–B *id*. 5121.

("MRI") studies in the near future. (*Id.*) On August 21, 2002, Plaintiff visited the Mercy Medical

Center, complaining of hip pain. (*Id.* at 335–36.) Examination and MRI studies of Plaintiff's

spine led to results compatible with low-grade bursitis in her left hip. (*Id.* at 336.)

On October 21, 2002, Plaintiff presented to Daniel Marsh, M.D. with complaints of severe

pain in her low back, hip, and neck. (*Id.* at 229.) Dr. Marsh diagnosed Plaintiff with hip joint

dysfunction, cervical disc herniation, and degenerative disc disease. (*Id.* at 231.) On October 28,

2002, Dr. Marsh administered a steroid injection to Plaintiff, which alleviated her pain for three

weeks. (*Id.* at 224, 227.) On November 1, 2002, Plaintiff again visited Dr. Kassan. (*Id.* at 321.)

Plaintiff reported marked pain improvement due to the steroid injection, but complained of

tenderness in her spine and dry eyes and mouth. (*Id.*) Dr. Kassan diagnosed Plaintiff with

Sjögren's syndrome and prescribed medications for pain and dry eyes. (*Id.*)

On November 26, 2002, Plaintiff complained to Dr. Marsh that her hip and back pain had

returned and she had new pain in her left leg. (*Id.* at 224.) On December 5, 2002, Dr. Marsh

administered another steroid injection. (*Id.* at 223.) On December 18, 2002, Plaintiff reported

that her hip and low back pain was "much improved" and her leg pain was gone, but she

continued to experience significant pain in her left groin. (*Id.*) Additionally, Plaintiff told Dr.

Marsh that she had not worked for a "year and a half because of pain."[2] (*Id.*)

---

[2]As the Commissioner notes, Plaintiff's statement stands in stark contrast with her
statement to a different physician on December 12, 2002 that she worked as a bartender and
manager at a café. (Admin. R. at 208.)

On February 11, 2003, Plaintiff presented to Kim Furry, M.D. and reported: (1) left hip and knee pain; (2) achy pain in her left groin and upper thighs; (3) weakness and stiffening in her knees; and (4) occasional burning pain down her legs. (*Id.* at 232.) Plaintiff told Dr. Furry that she had difficulties with activities of daily living and had stopped working because of her symptoms. (*Id.*) Dr. Furry noted that Plaintiff felt exacerbated pain upon walking or standing for prolonged periods of time and could walk only half a block before needing to rest. (*Id.*) Dr. Furry opined that surgery would not alleviate Plaintiff's discomfort and offered to administer steroid injections. (*Id.*) Plaintiff refused and opted to undergo physical therapy. (*Id.*)

On March 13, 2003, Plaintiff reported to Dr. Kassan that she was "doing about the same." (*Id.* at 318.) On April 24, 2003, Dr. Kassan examined Plaintiff's hips and spine. (*Id.* at 482.) Dr. Kassan reviewed X-rays and found spinal disc space narrowing and hip joint space narrowing. (*Id.*) Dr. Kassan opined that Plaintiff's condition had not changed since January 2003. (*Id.*)

Also on April 24, 2003, upon Dr. Kassan's referral, Plaintiff presented to Mark Mills, M.D. with complaints of left groin pain. (*Id.* at 234.) Dr. Mills examined Plaintiff and found that she: (1) had full range of motion of her left hip; (2) full range of motion and no swelling or tenderness of her left knee; and (3) no bony abnormalities. (*Id.*) Dr. Mills suspected that Plaintiff might have a hernia, and referred her to Jeffrey Cross, M.D. for further treatment. (*Id.*) On April 25, 2003, Plaintiff visited Dr. Cross and reported that she: (1) experienced burning and constant pain in her left groin upon exertion; (2) "lifts cases of beer as she is a bartendress [sic]," but had not lifted much for a few months; and (3) experienced "some pain with lifting milk." (*Id.* at 310.)

-4-

Dr. Cross surmised that Plaintiff might have a hernia.  (*Id.* at 311.)  On May 14, 2003, Dr. Cross

surgically corrected Plaintiff's hernia.  (*Id.* at 313–14.)

On September 9, 2003, Dr. Kassan diagnosed Plaintiff with arthritis and connective tissue

disease.  (*Id.* at 476.)  Plaintiff reported that she had received steroid injections in her hip, which

"dramatically" helped her pain.  (*Id.*)  Dr. Kassan prescribed medications and instructed Plaintiff

to return for additional treatment in six weeks.  (*Id.*)

On September 16, 2003, Plaintiff visited J.W. Ragsdale, Ph.D. for a consultative

psychological evaluation.  (*Id.* at 409–13.)  Dr. Ragsdale diagnosed Plaintiff with a chronic pain

disorder, a general anxiety disorder, fibromyalgia, and bursitis.  (*Id.* at 412.)  Dr. Ragsdale noted

that Plaintiff described herself as "one who would much rather prefer returning to gainful

employment than ever receiving any disability income" and assessed Plaintiff with a global

assessment functioning ("GAF") score of sixty-five.[3]  (*Id.* at 411–12.)

On September 19, 2003, Disability Determination Services consultant Richard Garnand,

M.D. completed a mental residual functional capacity assessment concerning Plaintiff, based on

Plaintiff's medical records to date.  (*Id.* at 414–31.)  Dr. Garnand opined that Plaintiff: (1) had

few limitations in her understanding, memory, and sustained concentration; (2) had no significant

---

[3]The GAF scale is a tool for rating an individual's social, occupational, and psychological functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., Text Revision, 2000).  An individual with GAF score between sixty-one and seventy generally functions "pretty well" and "has some meaningful interpersonal relationships," but experiences: (1) some mild symptoms, such as depressed mood and mild insomnia; or (2) some difficulty in social or occupational functioning.  *Id.*

limitations in social interaction or adaptation; and (3) was capable of work involving simple duties requiring little or no judgment. (*Id.* at 416.)

On October 20, 2003, Plaintiff visited Dr. Kassan and reported that steroid injections were alleviating her pain "to some degree." (*Id.* at 475.) On December 12, 2003, MRI studies of Plaintiff's spine revealed bulging discs. (*Id.* at 449.) On January 14, 2004 and January 29, 2004, Robert Bess, M.D. examined Plaintiff. (*Id.* at 450–55.) Dr. Bess found that Plaintiff had degenerative disc disease and suggested surgery. (*Id.* at 455.) On March 1, 2004, Dr. Bess performed a surgical bone graft and spinal fusion on Plaintiff. (*Id.* at 456.)

On August 17, 2004, Plaintiff presented to Dr. Kassan. (*Id.* at 432.) Dr. Kassan noted that Plaintiff "ha[d] done quite well" after the surgery performed by Dr. Bess and had experienced a "marked decrease" in her back pain, arthritis, and Sjögren's syndrome, but had developed some shoulder pain. (*Id.*)

On October 10, 2004, Dr. Bess completed a medical assessment of Plaintiff's abilities to perform work related activities. (*Id.* at 467–71.) Dr. Bess opined that Plaintiff could: (1) lift and carry up to twenty pounds occasionally; (2) sit, stand, or walk less than an hour at a time, up to two hours per day; and (3) occasionally climb stairs, but could not ever stoop, crouch, kneel, crawl, balance, or climb ladders. (*Id.*) Dr. Bess opined that these limitations first manifested in 2001, and expected that the limitations would last at least twelve months. (*Id.* at 471.)

On October 27, 2004, Kathleen McRay, M.D. completed a form setting forth her opinions on Plaintiff's mental abilities to perform work. (*Id.* at 472–74.) Dr. McCray opined that Plaintiff's impairments did not affect either her abilities to understand, remember, or carry out

short, simple instructions or her ability to make judgments on simple work related decisions.  (*Id.* at 472.)  Dr. McCray opined further that Plaintiff's impairments had a slight effect on her ability to carry out detailed instructions and a moderate effect on her ability to understand and remember detailed instructions.  (*Id.*)  Dr. McCray stated that because Plaintiff had not worked since 1999, she was not able to opine as to whether Plaintiff's impairments affected her abilities to respond to supervisors, co-workers, and work pressures.  (*Id.* at 473.)  Dr. McCray concluded that although she was "unable to pinpoint specific capabilities," Plaintiff was impaired by depression.  (*Id.*)

> ### b.    *Additional Medical Evidence Submitted to the Appeals Council*

On September 9, 2005 and October 20, 2005, Dr. Kassan stated he was "shocked to learn [he] was never contacted in connection with obtaining an assessment of [Plaintiff's] ability to do work related activities."  (*Id.* at 15.)  Dr. Kassan opined that Plaintiff "was certainly not capable of regular and continuous work" and submitted a form containing his opinion concerning the effects of Plaintiff's connective tissue disease.  (*Id.* at 14–20.)  Dr. Kassan opined that Plaintiff: (1) was incapable of performing even low stress jobs; (2) constantly experienced symptoms sufficiently severe to interfere with her attention and concentration; (3) could either sit or stand for forty-five minutes at a time for less than two hours total in a day; (4) could occasionally lift up to ten pounds; and (5) would need to be absent from work more than four times per month as a result of her impairments.  (*Id.* at 16–20.)  Dr. Kassan explained that Plaintiff's impairments had imposed these limitations since 2002.  (*Id.* at 15.)

On February 9, 2006, Dr. McCray signed a statement that she had reviewed and substantially agreed with: (1) Dr. Bess's October 13, 2004 medical assessment of Plaintiff's

physical abilities; and (2) Dr. Kassan's October 20, 2005 statement that Plaintiff could not work. (*Id.* at 12.)

**2.      *Procedural History***

On June 5, 2003, Plaintiff filed an application for disability insurance benefits. (*Id.* at 122–24.) On September 29, 2003, the Social Security Administration denied Plaintiff's application. (*Id.* at 110–13.) On October 29, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 114–15.) On September 23, 2004 the ALJ held a hearing, at which Plaintiff, Plaintiff's husband, and a vocational expert ("VE") testified. (*Id.* at 483–521.) Prior to taking any testimony, the ALJ noted that although Plaintiff argued she became disabled in January 1999, the issue before him was whether she was disabled from her alleged onset date until December 2003, the date she was last insured. (*Id.* at 485.)

Plaintiff testified that she had worked in the food and beverage service industry for many years, but, beginning in January 1999, "just couldn't do it anymore." (*Id.* at 494.) She testified that around January 1999, she began waking every morning feeling stiff and experiencing full-body pain. (*Id.*) Plaintiff testified that at the time of the hearing, she experienced full-body pain (meaning from "the top of [her] head to the bottom of [her] feet and everywhere in between") due to her fibromyalgia, but in January 1999, she experienced "unbearable pain" in her back and "burning pain" down her legs. (*Id.* at 494–95.) When asked whether her condition had worsened, Plaintiff explained that her condition had "just gotten worse over the years," but had stayed the same from December 2003 until the time of the hearing. (*Id.* at 497.)

She testified that every morning, she woke up experiencing stiffness and burning, aching pain in "[e]very joint, every ligament, [and] every muscle" and had to perform exercises in bed to "get the circulation going." (*Id.* at 496.)  Plaintiff testified that in March 2004, she underwent back surgery that alleviated the burning pain in her legs, but she still experienced pain in her neck, shoulders, and back, as well as at the site from which doctors took a bone graft during her surgery. (*Id.* at 495.)  Plaintiff stated that she took prescription painkillers and used ice and heat to alleviate her discomfort. (*Id.* at 509.)

Plaintiff testified that she could: (1) stand "for a couple of hours" and sit for about thirty minutes, as long as she could shift positions, but sitting longer than thirty minutes caused stiffness in her lower back and legs; and (2) walk "[a] couple of blocks," but walking long distances caused pain. (*Id.* at 498–99.)  Plaintiff testified that approximately two years prior to the hearing, Dr. Marsh told her she could only lift approximately five pounds. (*Id.* at 501.)  Plaintiff stated that prior to receiving Dr. Marsh's advice, she lifted fifteen or twenty pounds, even though "it felt bad and wrong to do." (*Id.*)  Plaintiff testified that she had been using a cane for "a couple of years" to stabilize herself because "any" of her " numerous medications" had caused her to experience dizziness two or three times a week. (*Id.* at 499–500.)

Plaintiff testified that on an average day, she typically: (1) slept five or six hours and awoke at 9:30 or 10:00 o'clock A.M.; (2) read books and newspapers; and (3) was confined to her room. (*Id.* at 506.)  Plaintiff stated that she had been diagnosed with anxiety and depression and experienced crying spells lasting "[a] couple of hours" every day. (*Id.* at 502.)  She testified that she stayed in bed or refused to eat all day one or two times a week. (*Id.* at 502–03.)  Plaintiff said

that sometimes anxiety overwhelmed her and she felt a need to escape from wherever she found herself at the moment.  (*Id.* at 504.)

Plaintiff stated that she "would love to work" and felt it "would be wonderful" if a job existed in which she could sit or stand at will and lift no more than five pounds.  (*Id.* at 507, 508.)  Still, she felt she would have trouble working eight hours a day.  (*Id.*)  She said she applied for jobs as a hotel receptionist and a store greeter, but was not hired.  (*Id.* at 508.)

Plaintiff's husband also testified at the hearing.  (*Id.* at 512–15.)  He stated that Plaintiff seemed depressed and rarely went out and that her condition had deteriorated since 2003.  (*Id.* at 512.)  He testified that he did most of the housework, including the majority of the laundry, vacuuming, washing dishes, and cleaning.  (*Id.* at 514.)

Finally, the VE testified at the hearing regarding her review of the vocational exhibits in Plaintiff's file.  (*Id.* at 516–19.)  The VE opined that an individual who could lift and carry no more than five pounds, would need a sit/stand option every half hour, and could understand, remember, and carry out short, simple instructions would be able to perform the following jobs: (1) small products assembler, which is a light exertional position with a specific vocational preparation ("SVP")[4] level two; and (2) final assembler or surveillance system monitor, which are both SVP level two sedentary positions.  (*Id.* at 517–18.)  The VE testified that the same

---

[4]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

individual could miss one or two days per month and remain employed, but not one day per week. (*Id.* at 518.)

On April 11, 2005, the ALJ issued a decision reflecting his findings that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.* at 96–108.)  The ALJ first found that Plaintiff had not engaged in substantial gainful activity since January 2, 1999.  (*Id.* at 100.)  The ALJ next determined that Plaintiff's back pain, Sjögren's syndrome, fibromyalgia, bursitis, depression, anxiety, and pain disorder were all medically determinable, severe impairments.  (*Id.*)  Despite their severity, the ALJ determined that Plaintiff's impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4 (the "Listings").  (*Id.* at 101.)  Additionally, the ALJ concluded that both Plaintiff's and her husband's statements and concerning Plaintiff's impairments and their impact on her ability to work as of December 31, 2003 were "not entirely credible in light of [Plaintiff's] own description of her activities and life style [sic], the reports of the treating and examining practitioners[,] and the findings made on examination."  (*Id.* at 102–03.)

Based on the evidence presented, the ALJ concluded that, based on her own testimony, Plaintiff had the RFC to "lift and carry up to five pounds and sit and stand throughout an eight hour day with the option to alternate positions every thirty minutes . . . [and] understand, remember, and carry out only short and simple instructions."  (*Id.* at 106.)  In accord with this RFC, the ALJ determined that Plaintiff was not disabled because she could perform work as a small parts assembler, final assembler, or surveillance system monitor, all of which are jobs existing in significant numbers in the national economy.  (*Id.* at 106–07.)

Plaintiff appealed the ALJ's decision.  As noted above, Plaintiff submitted approximately seventy-five pages of her medical sources' notes, opinions, and diagnostic data in connection with her appeal.  (*Id.* at 11–87.)  On March 23, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final administrative decision for the purposes of judicial review.  (*Id.* at 6–9.)  On April 17, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits.  (Compl. [filed Apr. 17, 2006].)  On August 14, 2006, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed Aug. 14, 2006] [hereinafter "Pl.'s Br."].)

# ANALYSIS

## 1.      *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C.A. § 1383(c)(3) (West 2007) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C.A. § 405(g) (West 2007). Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

twelve months." 42 U.S.C.A. § 1382c(a)(3)(A) (West 2007). In proving disability, a claimant

must make a *prima facie* showing that she is unable to return to the prior work she has

performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets

that burden, the Commissioner must show that the claimant can do other work activities and that

the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816

F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant

qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*,

482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled

or not disabled at any step; and, upon such a determination, the subsequent steps may be

disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th

Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any

substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a

medically severe impairment (or combination of impairments) which limits her physical or mental

ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches

or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* §

404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis

proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents

her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations

omitted). If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §

404.1520(e) (2007); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to

-14-

demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's

age, education, past work experience; and (2) there is availability of that type of work in the

national economy.  *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.

**3.      *Disability Determination***

      Plaintiff argues that the ALJ and Appeals Council committed four "plain errors."  (Pl.'s

Br. at 5–24.)  Specifically, Plaintiff argues that the ALJ erred: (1) along with the Appeals Council

in evaluating Dr. Kassan's opinions and failing to recontact him for more information; (2) in

evaluating Dr. Bess's medical opinions; (3) in evaluating Plaintiff's credibility; (4) in evaluating

Plaintiff's impairments under the Listings; and (5) in assessing Plaintiff's physical and mental RFC.

(*Id.*)  I need only address Plaintiff's first argument.

      Plaintiff's argument concerning Dr. Kassan's medical opinions is actually an assemblage of

arguments concerning the ALJ's and Appeals Council's alleged errors.  Plaintiff argues that the

ALJ erred in failing to: (1) discuss all of Dr. Kassan's opinions; (2) afford Dr. Kassan's opinions

controlling weight; (3) recontact Dr. Kassan to obtain additional evidence; and (4) discuss Dr.

Kassan's findings concerning Plaintiff's fibromyalgia and Sjögren's syndrome in evaluating the

Listings.  (*Id*. at 8–11.)  Further, Plaintiff argues that the Appeals Council erred by failing to give

adequate reasons for rejecting Dr. Kassan's opinions submitted in connection with Plaintiff's

appeal.  (*Id*. at 10–11.)

      Plaintiff's arguments are availing.  Although an ALJ is required to consider several factors

and "evaluate every medical opinion [] receiv[ed]," it is impossible to ascertain the weight the

ALJ accorded to Dr. Kassan's opinions.  29 C.F.R. § 404.1527 (2007).  The ALJ states "[t]o the

extent that any medical opinion of functional limitation arguably meets or equals a listing, said

opinion is rejected. . . .   The basis for accepting or rejecting . . . the medical opinions of record is

discussed below." (Admin. R. at 101.)  Subsequently, the ALJ only discusses and rejects certain

of Dr. Kassan's opinions from a period of time not relevant to Plaintiff's application.  (*Id.* at 104.)

The ALJ never expressly rejects, accepts, or assigns any weight to Dr. Kassan's treatment

notes or diagnoses from the relevant time period.  (*See id.* at 99–108, 316–63.)  If the

circumstances of this case were different, the ALJ's failure would likely be harmless error.  It is

beyond dispute that none of Dr. Kassan's opinions submitted to the ALJ contain limitations on

Plaintiff's abilities to perform work-related activities.  (*Id.* at 316–63, 475–82.)  As such, it could

be said that the ALJ implicitly accepted Dr. Kassan's opinions, given his findings that fibromyalgia

and Sjögren's syndrome were among Plaintiff's severe impairments.  (*Id.* at 100.)  Indeed, the

amount of deference the ALJ afforded Dr. Kassan's opinions only becomes relevant in the context

of the information Plaintiff submitted in connection with her appeal of the ALJ's decision.

In connection with her appeal, Plaintiff supplied a form in which Dr. Kassan opined that

Plaintiff: (1) was incapable of performing even low stress jobs; (2) constantly experienced

symptoms sufficiently severe to interfere with her attention and concentration; (3) could either sit

or stand for forty-five minutes at a time for less than two hours total in a day; (4) could

occasionally lift up to ten pounds; and (5) would need to be absent from work more than four

times per month as a result of her impairments.  (*Id.* at 16–20.)  The Appeals Council found that

the form set forth Dr. Kassan's opinion as of October 2005 and rejected it as untimely and

irrelevant because it involved a time period later than December 31, 2003.  (*Id.* at 7.)  This

rejection clearly ignores Dr. Kassan's statements that the restrictions on the form: (1) "ha[d] been

effective since [May] 2002;" and (2) "were in place prior to 12/31/03 [sic], the date [Plaintiff] was

last insured." (*Id.* at 15.)  If Dr. Kassan's statements are to be believed, his opinions clearly relate

to the time period relevant to Plaintiff's application.  It follows logically that whether the Appeals

Council's refusal to consider the opinions was error is a question that hinges upon the ALJ's

acceptance or rejection of Dr. Kassan's opinions.  *See O'Dell v. Shalala*, 44 F.3d 855, 859

(holding that court must consider new evidence submitted to the Appeals Council in evaluating

the Commissioner's disability determination).  Accordingly, I find that the ALJ erred by failing to

specify the weight he accorded Dr. Kassan's opinions and the reasons therefor.

As noted above, the ALJ was required to evaluate every medical opinion before him.  20

C.F.R. § 404.1527 (2007).  Due to the length of time Plaintiff visited Dr. Kassan, he is likely a

treating source, whose opinion merits controlling weight if it is: (1) "well-supported by medically

acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other

substantial evidence in the record."  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

If the opinion is deficient in either of these respects, then the ALJ must weigh the opinion in light

of several factors and state "good reasons" for the weight he ultimately assigns the opinion.[5]  *Id.*

at 1301.

---

[5]Those factors include: (1) the length of the treatment relationship and the frequency of
examination; (2) the nature and extent of the treatment relationship; (3) the degree to which the
physician's opinion is supported by and consistent with the record; and (4) whether the physician
is a specialist in the area upon which an opinion is rendered.  *Watkins*, 350 F.3d at 1301.

Determinations regarding the severity of Plaintiff's impairments, credibility, and RFC will necessarily be affected by the ALJ's acceptance or rejection of Dr. Kassan's opinions.  Therefore, I do not address Plaintiff's other arguments at this time.  On remand, the ALJ should consider and assign weight to Dr. Kassan's opinions or offer "specific, legitimate reasons" for disregarding them.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

**4.**      ***Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is REVERSED and REMANDED for proceedings consistent with this opinion.


Dated this 6th day of April, 2007.


                                            BY THE COURT:


                                            s/ Edward W. Nottingham
                                            EDWARD W. NOTTINGHAM
                                            United States District Judge